**TEXAS INSTRUMENTS INCORPORATED, Plaintiff-Appellant,**

**v.**

**CYPRESS SEMICONDUCTOR CORPORATION, LSI Logic Corporation, and VLSI Technology, Inc., Defendants-Appellees.**

**No. 96-1003.**

United States Court of Appeals, Federal Circuit.

July 19, 1996.

Kenneth R. Adamo, Jones, Day, Reavis & Pogue, Dallas, Texas, argued, for plaintiff-appellant. With him on the brief, was Thomas R. Jackson. Of counsel, was Timothy B. Dyk, Washington, D.C., and Jay C. Johnson, Texas Instruments, Inc., of Dallas, Texas.

C. Randall Bain, Brown & Bain, P.A., Phoenix, Arizona, argued, for defendants/cross-appellants. With him on the brief, was Alan H. Blankenheimer. Of counsel, were Paul H. Heller, Kenyon & Kenyon, New York City, and Daniel P. Quigley, Patricia A. Hubbard, and Shirley A. Kaufman, Brown & Bain, P.A.

Before RICH, MAYER, and LOURIE, Circuit Judges.

LOURIE, Circuit Judge.

Texas Instruments Incorporated ("TI") appeals from the final judgment of the United States District Court for the Northern Dis-

trict of Texas granting judgment as a matter of law to the defendants, Cypress Semiconductor Corporation, LSI Logic Corporation, and VLSI Technology, Inc., that they did not infringe TI's patents. *Texas Instruments Inc. v. Cypress Semiconductor Corp.*, Civ. No. 3-90-CV1590-H, 1995 WL 811944 (N.D.Tex. Sept. 6, 1995). We affirm.

BACKGROUND

TI is the assignee of U.S. Patents 3,716,764 and 4,043,027. These patents claim different aspects of a process for encapsulating electronic components in plastic. The '027 patent claims a transfer molding process for encapsulating a semiconductor device [40], also referred to as a semiconductor "die," in plastic without damaging the device [40] or the fine wires [52 and 54], referred to as "whisker" wires, that provide the electrical connections between the device [40] and metal leads [10, 12, and 14]. The metal leads [10, 12, and 14] permit connection from the device [40] to an external circuit. In the claimed process, the device [40] and the whisker wires [52 and 54] are protected because the plastic is injected from a gate [88] located on the opposite side of the mold cavity [64 and 66] from the device [40] and the whisker wires [52 and 54]. Figure 5, as shown below, illustrates the claimed process.

Fig. 5

Claims 12 and 14, with reference numbers to figure 5 and emphasis added, are at issue on appeal.

12. The process for encapsulating a semiconductor device [40] comprising:

electrically connecting each of the electrical terminals of the device [40] to a conductor [10 and 14] and *mechanically attaching a portion of said device to at least one of the conductors [12] for support;*

disposing the conductors [10, 12, and 14] generally in a common plane;

disposing the device [40] and a major portion of the means for making electrical connection [52 and 54] between the terminals and the conductors generally on one side of the plane;

holding the ends of the conductors [10, 12, and 14] extending from the mold cavity [64 and 66] while injecting a fluid insulating material into the mold cavity on the other side of the plane [88] to subsequently solidify and embed said device [40], the fluid insulating material being injected into a portion of the cavity remote from the device [40] and the means electrically connecting the terminals of the device to the conductors [52 and 54], whereby the fluid will not directly engage the device [40] and electrical connection means [52 and 54] at high velocity, and the conductors will be secured against appreciable displacement by the fluid.

14. A process for encapsulating a semiconductor device [40] comprising:

providing electrical connections [52 and 54] between electrical terminals of the device and *a plurality of conductors [10, 12, and 14] arranged in a substantially common plane, said device [40] and the thusly provided electrical connections [52 and 54] thereto being disposed on one side of said plane,*

disposing the device and portions of the conductors in a mold cavity [64 and 66], and

holding the conductors [10, 12, and 14] while injecting a fluid insulating material into the mold cavity for subsequently solidifying and embedding said device,

the fluid insulating material being injected into a portion of the cavity on the opposite side of said plane [88] to preclude direct high velocity engagement between the fluid and the device [40] and the electrical connections [52 and 54] thereto.

The '764 patent contains a specification identical to that of the '027 patent and claims the use of a lead frame [132] having conductor strips [136, 138, and 140] to support the device [142] during the transfer molding process.[1] After the semiconductor device [142] is encapsulated in plastic, the frame [132] is severed, leaving the conductor strips [136, 138, and 140] extending from the completed package in order to allow connection of the device [142] to an external circuit. Figure 9, as shown below, illustrates a metal lead frame as used in the claimed process.

Claims 16, 17, and 19 of the '764 patent are at issue on appeal. Claim 16, with reference numbers to figure 9 and emphasis added, is

1. The '764 patent issued from a division of an application filed December 16, 1963. The '027 patent issued from a continuation of a division of the same application filed on December 16, 1963. A third patent, U.S. Patent 3,439,238, issued on April 15, 1969 from the initial December 16, 1963 application. The claims of the '238 patent are directed to the improved semiconductor device resulting from the processes claimed in the '027 and '764 patents. The '238 patent is not at issue in these proceedings.

representative of the '764 patent claims on appeal.[2]

16. A method for providing electrical connections to and encapsulating a semiconductor device [142] comprising the steps of:

(a) providing a substantially flat metal sheet [132] having recesses [124, 126, 128, and 130] therein which divide the sheet [132] into a plurality of conductor strips [136, 138, and 140 (corresponding to 10, 12, and 14 in figure 5) ] which are spaced apart from one another for at least a major part of their lengths and which are joined together at at least one of their ends by at least one side piece which is spaced from a central region of the assembly, a plurality of the conductor strips [136, 138, and 140] extending from the side piece parallel to one another for at least part of their lengths;

(b) *conductively connecting one face of a semiconductor wafer [142] to one of said conductor strips [138 (corresponding to 12 in figure 5) ] in the central region;*

(c) conductively connecting electrodes on the opposite face of the wafer to conductor strips [136 and 140] at the central region by separate lead wires [144 and 146 (corresponding to 52 and 54 in figure 5) ];

(d) enclosing the central region of the assembly in plastic insulating material to surround the wafer and lead wires and parts of the conductor strips; and

(e) severing the conductor strips at positions spaced from the central region to eliminate the remainder of the sheet [132] including the side piece.

Cypress Semiconductor Corporation, LSI Logic Corporation, and VLSI Technology, Inc. import and sell semiconductor devices. These devices are significantly more complicated than the devices shown in TI's patents due to advances in semiconductor technology. However, despite the advances in semiconductor technology, the defendants still encapsulate the devices using a transfer molding process.

In the accused transfer molding processes, the defendants employed a metal lead frame that differed from the one shown in TI's patents in that the semiconductor device was attached to the lead frame at a "die pad," not a conductor strip. The die pad supported the semiconductor device, but did not extend outside the completed encapsulated semiconductor device for connection to an external circuit. In addition, the die pad was situated 10–15 mils below the lead frame's conductor strips. The device was connected to the conductor strips via whisker wires. In the defendants' processes, the lead frame and the device were placed in a mold cavity and a fluid insulating material was injected into the mold cavity. The fluid was injected at a gate located on the opposite side of the lead frame from the semiconductor device and the whisker wires. After encapsulation, the lead frame was severed, leaving the conductor strips extending from the completed package for connection of the device to an external circuit.[3]

On July 9, 1990, TI initiated an action under 19 U.S.C. § 1337 at the International Trade Commission ("ITC") against several semiconductor manufacturers, including all of the present defendants. TI alleged that these companies engaged in unfair methods of competition and unfair acts based on the importation and sale of encapsulated circuits produced by processes purportedly covered by claims 1, 12, 14, and 17 of the '027 patent. An administrative law judge ("ALJ") determined that claim 14 was literally infringed and that claim 12 was infringed under the doctrine of equivalents. Upon review of the ALJ's decision, the Commission agreed with the ALJ that claims 12 and 14 of the '027 patent were infringed, and it issued a limited exclusion order prohibiting the companies from importing integrated circuits manufactured abroad using any process covered by claims 12 and 14. *In re Certain Plastic*

2. Claims 17 and 19 depend from claim 16.

3. For a further discussion of the defendants' processes, *see Texas Instruments Inc. v. United States International Trade Commission,* 988 F.2d 1165, 1170, 26 USPQ2d 1018, 1022 (Fed.Cir.1993).

*Encapsulated Integrated Circuits,* Inv. No. 337–TA–315, USITC Pub. No. 2574 (Nov. 1992). On appeal, we construed the claims *de novo* and held that substantial evidence supported the Commission's infringement findings. Accordingly, we affirmed the ITC's determination and exclusion order. *Texas Instruments Inc. v. United States Int'l Trade Comm'n,* 988 F.2d 1165, 26 USPQ2d 1018 (Fed.Cir.1993).

Contemporaneously with the ITC proceeding, TI sued the same companies in the Northern District of Texas, alleging infringement of both the '027 and '764 patents. After a 17–day trial that commenced on April 17, 1995, the jury returned a verdict finding that the defendants wilfully infringed claims 12 and 14 of the '027 patent and claims 16, 17, and 19 of the '764 patent. The jury did not specify whether it found literal infringement or infringement under the doctrine of equivalents. In addition, the jury awarded reasonable royalty damages to TI of more than $51 million. Despite the jury's verdict, the court granted, in part, the defendants' motion for judgment as a matter of law and set aside the verdict. *Texas Instruments Inc. v. Cypress Semiconductor Corp.,* Civ. No. 3–90–CV1590–H, 1995 WL 811944 (N.D.Tex. Sept. 6, 1995). In particular, the court determined that no reasonable jury could have found literal infringement of claim 12 of the '027 patent and claim 16 of the '764 patent because none of the defendants secured the semiconductor device to a "conductor" as required by the claims. In addition, the court found that TI did not prove literal infringement of claim 14 of the '027 patent because it failed to offer any evidence that the defendants placed the semiconductor device *entirely* on one side of the plane formed by the conductors during the process. As to infringement under the doctrine of equivalents, the court held that it could not uphold a finding of infringement because TI failed to provide particularized testimony and linking argument as required by our holding in *Lear Siegler, Inc. v. Sealy Mattress Co.,* 873 F.2d 1422, 10 USPQ2d 1767 (Fed.Cir.1989). As an alternative to its grant of JMOL in favor of the defendants, the court conditionally, in the event we reversed its judgment, granted a new trial on infringement and damages on the ground that the jury failed to meaningfully deliberate. TI appeals.

## DISCUSSION

When a party moves for JMOL in a case tried to a jury, we review the district court's decision *de novo* by reapplying the JMOL standard. *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 975, 34 USPQ2d 1321, 1326 (Fed.Cir.1995) (in banc), *aff'd,* — U.S. ——, 116 S.Ct. 1384, 134 L.Ed.2d 577, 38 USPQ2d 1461 (1996). Judgment as a matter of law against a party is appropriate when "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fed.R.Civ.P. 50(a)(1). We review the legal standards that the jury applied in reaching its verdict to determine whether they were correct as a matter of law. *Markman,* 52 F.3d at 975, 34 USPQ2d at 1326. We review the jury's resolution of all factual disputes for substantial evidence. *Id.* Substantial evidence is "such relevant evidence from the record taken as a whole as might be accepted by a reasonable mind as adequate to support the finding under review." *Perkin–Elmer Corp. v. Computervision Corp.,* 732 F.2d 888, 893, 221 USPQ 669, 673 (Fed.Cir.), *cert. denied,* 469 U.S. 857, 105 S.Ct. 187, 83 L.Ed.2d 120 (1984).

### A. *Infringement*

An infringement analysis requires two separate steps. First, the court must construe the claims asserted to be infringed as a matter of law in order to establish their meaning and scope. *Markman v. Westview Instruments, Inc.,* — U.S. ——, ——, 116 S.Ct. 1384, 1393, 134 L.Ed.2d 577, 38 USPQ2d 1461, 1468 (1996). Second, the claims as construed are compared to the allegedly infringing device or process. *Id.* To literally infringe, the accused device or process must contain every limitation of the asserted claim. *See Laitram Corp. v. Rexnord, Inc.,* 939 F.2d 1533, 1535, 19 USPQ2d 1367, 1369 (Fed.Cir.1991). Even if the accused device or process does not literally infringe, it may infringe under the doctrine of equivalents if the differences between the

claimed invention and the accused device or process are "insubstantial." *Hilton Davis Chem. Co. v. Warner–Jenkinson Co.,* 62 F.3d 1512, 1518, 35 USPQ2d 1641, 1645 (Fed.Cir. 1995) (in banc) (per curiam), *cert. granted,* — U.S. —, 116 S.Ct. 1014, 134 L.Ed.2d 95 (1996).

1. *Literal Infringement*

a. *The "Connecting the Device to a Conductor" Limitation of Claim 12 of the '027 Patent and Claim 16 of the '764 Patent*

Both parties agree that claim 12 of the '027 patent and claim 16 of the '764 patent require the semiconductor device to be connected to a "conductor."[4] The district court construed the term "conductor" to include "those portions of the [lead frame] assembly that extend from inside the package to the outside, and connect the semiconductor device to an external circuit. In other words, [conductors] are leads." *Texas Instruments Inc. v. Cypress Semiconductor Corp.,* Civ. No. 3–90–CV1590–H, slip op. at 10 n. 6, 1995 WL 811944 (N.D.Tex. Sept. 6, 1995). On appeal, TI argues that the court misconstrued the term "conductor." In particular, TI asserts that a "conductor" encompasses any element capable of conducting electricity.

We disagree. Although the dictionary broadly defines "conductor" as any substance that conducts an electrical charge, the patent itself belies such a broad construction. *See Quantum Corp. v. Rodime, PLC,* 65 F.3d 1577, 1580, 36 USPQ2d 1162, 1165 (Fed.Cir. 1995) ("[T]he words of a claim will be given their ordinary meaning to one of skill in the art unless the inventor appeared to use them differently."), *cert. denied,* — U.S. —, 116 S.Ct. 1567, 134 L.Ed.2d 666 (1996). Claim 12 states that the "ends of the conductors extend[ ] from the mold cavity" and are held during the encapsulation process. In addition, claim 16 requires "enclosing the ... assembly in plastic insulating material to surround the [semiconductor device] and *parts of the conductor strips.*" Thus, both claims indicate that a "conductor" for purposes of the invention extends beyond the plastic encapsulation. The specification further supports the district court's claim construction. Figure 8 of each patent illustrates the completed encapsulated semiconductor devices made by the claimed processes, with the conductors extending from the device. In discussing these completed devices, the specification states that "the respective conductor wires can subsequently be cut away to a customer's specification so that any arrangement of *leads* ... can be provided for integration into substantially any circuit." '027 patent: Col. 7, 11. 3–7; '764 patent: Col. 6, 11. 54–58 (emphasis added). Thus, the patentee did not use the term "conductors" in the claims as the term is defined in the dictionary, *i.e.,* any structure capable of conducting electricity; instead, the patentee used the term in the claims to mean leads that "extend from inside the package to the outside, and connect the semiconductor device to an external circuit." *Texas Instruments,* slip op. at 10 n.6. The court did not err in so construing the claims.

TI asserts that even accepting the court's claim construction, it presented substantial evidence to support a finding of literal infringement. TI argues that during the encapsulation processes used by the defendants, the semiconductor device was supported by the "die pad," which acted like a "conductor." TI relies on evidence that allegedly demonstrates that, during encapsulation, the semiconductor device was mechanically attached to the die pad with an electrically conductive adhesive; in turn, the die pad was connected through the lead frame to an external ground, forming a conductive, continuous current path from the die to ground. According to TI, this current path protected the die from static electricity during assembly and encapsulation. TI contends that the testimony of its expert witnesses supports this theory.

We have carefully considered TI's evidence that the die pad acted as a "conductor" during the defendants' encapsulation processes

4. The process in claim 12 requires "mechanically attaching a portion of said device to at least one of the conductors for support." The process in claim 16 also requires "conductively connecting one face of a semiconductor wafer to one of said conductor strips in the central region."

and we do not believe a reasonable jury could have found literal infringement based on this evidence. Although TI's experts testified that the die pads used by the defendants in their processes extended *from inside* the package to outside the package during encapsulation, TI failed to provide evidence that the defendants connected the die pad to an external circuit, as required by the claims. One of TI's experts, McAlexander, testified that "the die pad is a conductor, that it is capable of conducting current, and that it functions as a conductor." However, McAlexander's testimony was solicited based on TI's construction of the term "conductor" as meaning anything capable of conducting electricity. TI's attempts to recast the testimony to support a finding of infringement under the proper claim construction are to no avail. TI failed to present evidence that the defendants used a process in which the semiconductor device was connected to a conductor that extended from the device for connection to an external circuit, *i.e.*, that the device was connected to a lead.

Alternatively, TI argues that substantial evidence supports a finding of literal infringement of claims 12 and 16 because the die pad in the final packaged product acts as a "conductor" under the court's claim construction. We disagree. Although TI presented evidence that the defendants may have electrically connected the die pad to an external circuit in their final products, TI did not submit evidence establishing that the die pad itself extended outside the package after manufacture as required by the claims. Instead, TI presented evidence that the die pad was connected *via a whisker wire* to a lead that extended outside the package for connection to an external circuit. Therefore, because the die pad itself did not extend from inside to outside the package in the final encapsulated product, no reasonable jury could have found that the die pad was a "conductor" in the accused processes. We thus agree with the district court's conclusion on the lack of literal infringement of claims 12 and 16.

b. *The "Device Being Disposed on One Side of the Plane Formed by the Conductors" Limitation of Claim 14 of the '027 Patent*

■ Although claim 14 of the '027 patent does not require "connecting the device to a conductor," the district court held that no reasonable jury could have found literal infringement of the claim because TI failed to offer any evidence that defendants' processes met the claim limitation requiring "a plurality of conductors arranged in a substantially common plane, said device and the thusly provided electrical connections thereto being disposed on one side of said plane." The court instructed the jury that this language requires that "the conductors must be on the same plane, except for minor deviations." The court further instructed the jury that the claims require placing "the entire device ... *entirely* on one side of the plane formed by the conductors." On appeal, TI does not contest the court's instructions regarding this claim. Instead, TI argues that it presented evidence that the die pad was only slightly depressed from the conductors and therefore was in the "substantially common plane." Because the semiconductor device was entirely on one side of the die pad, TI asserts that substantial evidence supports the jury's verdict of infringement.

Neither party disputes that the "conductors" used in the defendants' processes were on the same plane except for minor deviations so as to form a "substantially common plane." TI presented no evidence, however, that the "substantially common plane" formed by these "conductors" extended below the die pad so that the semiconductor device, when attached to the die pad, was entirely on one side of the plane formed by the conductors.[5] In fact, both parties agree that the defendants' die pads were depressed 10–15 mils below the "conductors." Therefore, the die pads were depressed 10–15 mils below the "substantially common plane" formed by these conductors. Because the semiconductor device was attached to the die pad below the substantially common plane formed by the conductors, the court properly

5. As we construe these claims, the die pad does not constitute a "conductor" and therefore does not assist in forming the "substantially common plane" of conductors.

determined that no reasonable jury could have found literal infringement of claim 14. Hence, we agree with the court's conclusion of lack of infringement with respect to claim 14 of the '027 patent.

2. *The Doctrine of Equivalents*

TI also argues that the district court erred in granting the defendants' JMOL motion because substantial evidence supports a finding of infringement under the doctrine of equivalents.[6] In particular, TI argues that the district court erred by requiring "particularized testimony and linking argument," as set forth in our decision in *Lear Siegler,* asserting that our recent in banc decision in *Hilton Davis* overruled *Lear Siegler.* Further, TI argues that even if our court did not eliminate this requirement in *Hilton Davis,* TI presented sufficient evidence to support the jury's verdict of infringement.

In *Hilton Davis,* we held that "the application of the doctrine of equivalents rests on the substantiality of the differences between the claimed and accused products or processes, assessed according to an objective standard." *Hilton Davis,* 62 F.3d at 1518, 35 USPQ2d at 1645. In doing so, we recognized that the function, way, result test applied in *Graver Tank & Mfg. Co., Inc. v. Linde Air Products Co.*, 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950) often sufficed to show the substantiality of the differences. *Id.* However, we further acknowledged that the function, way, result test was not "the" sole test for equivalency. *Id.* Instead, we stated that other "*objective* evidence rather than unexplained subjective conclusions" may be relevant to the determination whether the differences between the accused product or process and the claimed invention are insubstantial. *Id.* at 1519, 35 USPQ2d at 1646 (emphasis added). Such evidence may include evidence of known interchangeability to one of ordinary skill in the art, copying, and designing around. Thus, we recognized that the doctrine of equivalents was "not the prisoner of a formula" and "the available relevant evidence may vary from case to case." *Id.* at 1518, 35 USPQ2d at 1645.

However, we further stated that "[the *Hilton Davis* ] case presents an opportunity to restate—not to revise—the test for infringement under the doctrine of equivalents." *Id.* at 1516, 35 USPQ2d at 1644. Consequently, we did not, as the defendants contend, overrule our prior decisions that addressed the specific evidentiary requirements necessary to prove infringement under the doctrine of equivalents. In particular, we did not eliminate the need to prove equivalency on a limitation-by-limitation basis. *See Pennwalt Corp. v. Durand-Wayland, Inc.*, 833 F.2d 931, 935, 4 USPQ2d 1737, 1739–40 (Fed.Cir. 1987) (in banc), *cert. denied,* 485 U.S. 961, 108 S.Ct. 1226, 99 L.Ed.2d 426 (1988);[7] *see also Athletic Alternatives, Inc. v. Prince Mfg., Inc.*, 73 F.3d 1573, 1582, 37 USPQ2d 1365, 1373 (Fed.Cir.1996) (applying the *Pennwalt* rule after our in banc decision in *Hilton Davis* ). Nor did we overrule precedent requiring equivalency to be proven with "particularized testimony and linking argument." *See Lear Siegler, Inc. v. Sealy Mattress Co.*, 873 F.2d 1422, 10 USPQ2d 1767 (Fed.Cir.1989); *Malta v. Schulmerich Carillons, Inc.*, 952 F.2d 1320, 21 USPQ2d 1161 (Fed.Cir.1991), *cert. denied,* 504 U.S. 974, 112 S.Ct. 2942, 119 L.Ed.2d 566 (1992). The majority opinion in *Hilton Davis* does not cite or even discuss *Malta* or *Lear Siegler.* Our court set forth these evidentiary requirements in those earlier cases because, although the standard for infringement under the doctrine of equivalents is simple to artic-

6. TI further argues that the defendants' pre-verdict JMOL motion did not allege failure of TI's proof or argument concerning the doctrine of equivalents. Thus, under Federal Rules of Civil Procedure Rule 50, TI contends that the defendants failed to preserve the issue for purposes of the post-verdict JMOL motion. We rejected this argument in *Malta v. Schulmerich Carillons, Inc.*, 952 F.2d 1320, 21 USPQ2d 1161 (Fed.Cir.1991), *cert. denied,* 504 U.S. 974, 112 S.Ct. 2942, 119 L.Ed.2d 566 (1992), where we held that an oral, pre-verdict motion requesting a directed verdict on the issue of noninfringement was sufficient to support a post-verdict motion concerning the doctrine of equivalents. 952 F.2d at 1324–25, 21 USPQ2d at 1164. We hold similarly here.

7. In fact, the majority opinion in *Hilton Davis* cites *Pennwalt* on several occasions as support for the "insubstantial differences" standard. *E.g., Hilton Davis,* 62 F.3d at 1517, 35 USPQ2d at 1645.

ulate, it is conceptually difficult to apply. These evidentiary requirements assure that the fact-finder does not, "under the guise of applying the doctrine of equivalents, erase a plethora of meaningful structural and functional limitations of the claim on which the public is entitled to rely in avoiding infringement." *Pennwalt,* 833 F.2d at 935, 4 USPQ2d at 1739 (quoting *Perkin–Elmer Corp. v. Westinghouse Elec. Corp.,* 822 F.2d 1528, 3 USPQ2d 1321 (Fed.Cir.1987)). Moreover, without these requirements, the fact-finder has no analytical framework for making its decision and is "put to sea without guiding charts when called upon to determine infringement under the doctrine [of equivalents]." *Lear Siegler,* 873 F.2d at 1426, 10 USPQ2d at 1770. In addition, we, as the reviewing court, would lack the assurance that the jury was fully presented with a basis for applying the doctrine of equivalents.

Hence, the district court properly determined that our decision in *Hilton Davis* did not overrule *Lear Siegler.* Pursuant to our precedent, a patentee must still provide particularized testimony and linking argument as to the "insubstantiality of the differences" between the claimed invention and the accused device or process, or with respect to the function, way, result test when such evidence is presented to support a finding of infringement under the doctrine of equivalents. Such evidence must be presented on a limitation-by-limitation basis. Generalized testimony as to the overall similarity between the claims and the accused infringer's product or process will not suffice.

TI argues that a recent panel decision from this court supports its argument that the in banc decision in *Hilton Davis* overruled *Lear Siegler.* In *National Presto Industries Inc. v. West Bend Co.,* 76 F.3d 1185, 37 USPQ2d 1685 (Fed.Cir.1996), a panel of this court stated that "The court's *en banc* decision in *Hilton Davis* made clear that no specific formulation of evidence and argument is required.... [I]ndeed, neither *Lear–Siegler* nor *Malta* requires any particular formulation." 76 F.3d at 1191, 37 USPQ2d at 1688.

To the extent that *National Presto* decided that particularized testimony and linking argument as to each prong of the function, way, result test was not required in that particular case, it is not the province of this panel to second guess it. However, *National Presto* did not hold that particularized testimony and linking argument cannot generally be required in a doctrine of equivalents analysis, because it cannot overrule the prior panel decisions in *Lear Siegler* and *Malta. Newell Cos., Inc. v. Kenney Mfg. Co.,* 864 F.2d 757, 765, 9 USPQ2d 1417, 1423 (Fed.Cir.1988) ("This court has adopted the rule that prior decisions of a panel of the court are binding precedent on subsequent panels unless and until overturned *in banc.*"), *cert. denied,* 493 U.S. 814, 110 S.Ct. 62, 107 L.Ed.2d 30 (1989). As demonstrated above, our decision in *Hilton Davis* is not to the contrary. Thus, particularized testimony and linking argument are still important in a jury case.

Here, we agree with the district court that TI failed to present sufficient evidence to support a finding of infringement under the doctrine of equivalents.[8] TI attempts to support the jury's verdict with the testimony of its two expert witnesses, McAlexander and Seiling. The overwhelming majority of McAlexander's testimony, however, was solicited for purposes of establishing literal infringement under TI's improper interpretation of the term "conductor"; it did not purport to and therefore was insufficient to establish infringement under the doctrine of equivalents. *See Lear Siegler,* 873 F.2d at 1425, 10 USPQ2d at 1770 ("The evidence and argument on the doctrine of equivalents cannot merely be subsumed in plaintiff's case of literal infringement."). In addition, McAlexander's testimony that the "conductors" in the accused processes and the claimed processes were the "same" and performed the

8. In this case, the court charged the jury only as to the function, way, result test for purposes of finding infringement under the doctrine of equivalents. In particular, the instruction provided:

> To find that Cypress, LSI and VLSI infringed the '027 or '764 patents under the doctrine of equivalents, you must find that Cypress, LSI and VLSI's processes perform substantially the same function, in substantially the same way, to produce substantially the same results as the elements recited in the corresponding claim of the '027 or '764 patent.

"same function" was merely generalized testimony as to overall similarity. Thus, he did not provide particularized testimony regarding the equivalency of the claim limitations in dispute, and his testimony cannot support a finding that the differences were "insubstantial."

Seiling's testimony also was insufficient. Seiling testified, in conclusive fashion, that the accused processes, under the proper claim construction, met the *Graver Tank* function, way, result test. However, his testimony was insufficient because, as the district court stated, "[t]here [was] no discussion of whether or how the way the die pad operates [was] similar to the patent claim, nor [was] there any particularized testimony explaining *why* the function and result [were] the same, especially with respect to the conductive function of the conductor in the patent." *Texas Instruments Inc. v. Cypress Semiconductor Corp.,* Civ. No. 3–90–CV1590–H, slip op. at 17, 1995 WL 811944 (N.D.Tex. Sept. 6, 1995).

In sum, we agree with the district court that TI failed to present evidence sufficient to support a finding of infringement under the doctrine of equivalents. Therefore, we affirm the court's grant of JMOL on this issue.

B. *Issue Preclusion*

TI next argues that the ITC's previous finding that the same defendants, using the same processes, infringed claims 12 and 14 of the '027 patent, and that our subsequent affirmance of that determination should be given preclusive effect. *See In re Certain Plastic Encapsulated Integrated Circuits,* Inv. No. 337–TA–315, USITC Pub. No. 2574 (Nov. 1992), *aff'd, Texas Instruments Inc. v. United States Int'l Trade Comm'n,* 988 F.2d 1165, 26 USPQ2d 1018 (Fed.Cir.1993). In support, TI contends that preclusive effect is properly given to determinations made in a federal agency's adjudicatory capacity. TI also asserts that the district court erred in failing to permit the jury to be informed of the prior ITC holding.

The doctrine of issue preclusion [9] (or collateral estoppel) has been defined to mean that "[w]hen an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim." RESTATEMENT (SECOND) OF JUDGMENTS § 27 (1982). The purpose of the doctrine is to "relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication." *Allen v. McCurry,* 449 U.S. 90, 94, 101 S.Ct. 411, 415, 66 L.Ed.2d 308 (1980). The decision of an administrative agency may be given preclusive effect in a federal court when, as here, the agency acted in a judicial capacity. *See University of Tennessee v. Elliott,* 478 U.S. 788, 797–98, 106 S.Ct. 3220, 3225–26, 92 L.Ed.2d 635 (1986); *United States v. Utah Constr. & Mining Co.,* 384 U.S. 394, 422, 86 S.Ct. 1545, 1560, 16 L.Ed.2d 642 (1966). However, an administrative agency decision, issued pursuant to a statute, cannot have preclusive effect when Congress, either expressly or impliedly, indicated that it intended otherwise. *Astoria Fed. Sav. & Loan Ass'n v. Solimino,* 501 U.S. 104, 110, 111 S.Ct. 2166, 2170–71, 115 L.Ed.2d 96 (1991).

Here, the administrative proceedings were commenced before the ITC under section 337, as amended, of the Tariff Act of 1930. 19 U.S.C. § 1337 (1994). In 1974, Congress passed the Trade Reform Act of 1974, amending the Tariff Act of 1930 to allow respondents in ITC proceedings to plead, and the ITC to consider, all legal and equitable defenses, including patent invalidity and unenforceablility. *See Lannom Mfg. Co. v. United States Int'l Trade Comm'n,* 799 F.2d 1572, 1576–79, 231 USPQ 32, 35–36 (Fed.Cir.1986) (discussing the Trade Reform Act of 1974). In authorizing the Commission

9. Our analysis here is limited to the doctrine of issue preclusion. We recently held that an ITC's prior decision concerning patent infringement or validity cannot have claim preclusive effect in district courts. *Bio–Technology General Corp. v. Genentech, Inc.,* 80 F.3d 1553, 38 USPQ2d 1321 (Fed.Cir.1996).

to consider these defenses, Congress cautioned that:

> [I]n patent-based cases, the Commission considers, for its own purposes under section 337, the status of imports with respect to the claims of U.S. patents. The Commission's findings neither purport to be, nor can they be, regarded as binding interpretations of the U.S. patent laws in particular factual contexts. Therefore, it seems clear that any disposition of a Commission action by a Federal Court should not have res judicata or collateral estoppel effect in cases before such courts.

S.Rep. No. 1298, 93d Cong., 2d Sess. 196 (1974), *reprinted in* 1974 U.S.C.C.A.N. 7186, 7329. Based on this legislative history, we have stated that Congress did not intend decisions of the ITC on patent issues to have preclusive effect. *See Tandon Corp. v. United States Int'l Trade Comm'n,* 831 F.2d 1017, 1019, 4 USPQ2d 1283, 1285 (Fed.Cir.1987) ("[O]ur appellate treatment of decisions of the Commission does not estop fresh consideration by other tribunals."). *See also Texas Instruments Inc. v. United States Int'l Trade Comm'n,* 851 F.2d 342, 344, 7 USPQ2d 1509, 1510 (Fed.Cir.1988) (stating that ITC determinations regarding patent issues should be given no collateral estoppel effect); *Corning Glass Works v. United States Int'l Trade Comm'n,* 799 F.2d 1559, 1570 n. 12, 230 USPQ 822, 830 n. 12 (Fed.Cir.1986) (stating that the legislative history of the Trade Reform Act of 1974 supports the position that ITC decisions have no preclusive effect in district courts).

Recent changes to ITC procedures and the formation of this court as the exclusive appellate court for patent cases, including ITC determinations, do not compel a different rule. *See* Federal Courts Improvement Act of 1982, Pub.L. No. 97–164, 96 Stat. 25 (granting appellate jurisdiction to the Federal Circuit in appeals from the ITC and district court patent cases) (codified at 28 U.S.C. § 1295); Omnibus Trade and Competitiveness Act of 1988, Pub.L. No. 100–418, 102 Stat. 1107 (1988) (modifying ITC procedures) (codified at 19 U.S.C. § 1337); Uruguay Round Agreements Act, Pub.L. No. 103–465, 108 Stat. 4809 (1994) (removing strict statutory time limits for ITC determinations) (codified at 19 U.S.C. § 1337). While those changes have modified some ITC procedures and provided the ITC with the same appellate court of review as that of district courts deciding patent issues, none of these statutory amendments or their legislative histories dealt with the possible preclusive effect of ITC determinations or indicated an intent contrary to Congress's stated intention in 1974. Thus, the rule that decisions of the ITC involving patent issues have no preclusive effect in other forums has not changed.[10]

TI also argues that by our denying preclusive effect to ITC determinations and to our decisions in appeals from ITC decisions, district courts would be free to ignore our decisions. That is not correct. District courts are not free to ignore holdings of this court that bear on cases before them. Subsequent panels of this court are similarly not free to ignore precedents set by prior panels of the court.

However, once we accept, as we have done at least since 1986, that ITC decisions are not binding on district courts in subsequent cases brought before them, it necessarily follows that accused infringers can raise whatever defenses they believe are justified, regardless whether they previously raised them and lost in the ITC. The district court can attribute whatever persuasive value to the prior ITC decision that it considers justified. And we, on appeal, must be free to thoroughly review the district court's decision. As a court we are bound to follow our own precedents, and, to the extent that we have previously ruled on a matter, a subsequent panel will have powerful incentives not to deviate from that prior holding, short of thoroughly justified grounds.

**10.** Moreover, allowing prior ITC decisions on patent infringement questions to have preclusive effect would potentially deprive the parties of their Seventh Amendment right to a jury trial on the issue of infringement. *But cf. Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 335–37, 99 S.Ct. 645, 653–55, 58 L.Ed.2d 552 (1979) (application of collateral estoppel to a legal action based on an equitable determination does not violate Seventh Amendment right to a jury trial).

In this case, our construction of the term "conductor" is in fact consistent with the ITC's construction of the term and is consistent with our decision affirming the ITC's determination. *See In re Certain Plastic Encapsulated Integrated Circuits,* Inv. No. 337–TA–31 at *8–12, *38–39 (Oct. 16, 1991) (initial determination). Moreover, our construction of the limitation in claim 14 requiring the device to be disposed entirely on one side of the plane formed by the conductors was not the subject of a holding by either the ITC or the prior Federal Circuit panel; the parties did not litigate this claim construction issue in the prior proceeding. Thus, no holding in the prior ITC case or its affirmance by our court precludes our affirmance of the district court here.[11]

In conclusion, this case has presented a fairly uncommon situation of a trial judge overriding a jury verdict in a patent case, following an earlier ITC decision on some of the same subject matter. Although we have been mindful of the deference accorded to a jury on fact findings, as the trial judge surely was, we have felt it necessary to affirm the district court's judgment. The trial judge did a careful and thorough job of analyzing the case. His factual and legal analyses fully support his decision. He observed the jury and believed that it lacked a grasp of the issues before it. The judge was convinced that the jury failed to meaningfully deliberate on the case. Under these circumstances, our duty to affirm is clear.

## CONCLUSION

We affirm the district court's grant of JMOL on the issue of literal infringement. We affirm the district court's decision that the defendants did not infringe under the doctrine of equivalents because TI failed to provide "particularized testimony and linking argument" as required by our decision in *Lear Siegler, Inc. v. Sealy Mattress Co.,* 873 F.2d 1422, 10 USPQ2d 1767 (Fed.Cir.1989). We also conclude that the court correctly denied preclusive effect to the prior ITC determination involving one of the patents in this case.

The parties shall bear their respective costs.

***AFFIRMED.***

11. In view of our determination that the ITC decision does not control this case, we conclude that the district court did not err in its decision not to inform the jury of that decision. *See Mendenhall v. Cedarapids, Inc.,* 5 F.3d 1557, 1566–75, 28 USPQ2d 1081, 1089–97 (Fed.Cir. 1993) (affirming the trial judge's exclusion of evidence concerning other litigation involving the same patents), *cert. denied,* — U.S. ——, 114 S.Ct. 1540, 128 L.Ed.2d 192 (1994).