**MENTOR GRAPHICS CORPORATION, an Oregon corporation, Plaintiff,**

v.

**QUICKTURN DESIGN SYSTEMS, INC., a California corporation, Defendant.**

No. CV 96–342–RE.

United States District Court,
D. Oregon.

Aug. 15, 1997.

James T. McDermott, Ball Janik LLP, Portland, OR, William L. Anthony, Jr., Robert DeBerardine, Craig Y. Allison, Taraneh Maghame', Brobeck Phleger & Harrison, Palo Alto, CA, for Plaintiff.

Alan T. McCollom, Marger Johnson McCollom & Stolowitz, Inc., Portland, OR, James W. Geriak, James C. Brooks, Theodore S. Maceiko, Lawrence R. LaPorte, Allan W. Jansen, Jonathan T. Losk, Lyon & Lyon, Los Angeles, CA, Steven D. Hemminger, Lyon & Lyon LLP, San Jose, CA, for Defendant.

## OPINION

REDDEN, District Judge.

·Quickturn Design Systems, Inc. ("Quickturn") moves for a preliminary injunction to enjoin Mentor Graphics Corporation and Meta Systems (collectively referred to as Mentor) from domestic manufacture and sales of Meta Series 500 and 500M emulation systems (also known as SimExpress). For the reasons that follow, Quickturn's motion for preliminary injunction (doc. # 151) is GRANTED.

## BACKGROUND

A more complete discussion of the background of this case can be found in this court's opinion dated December 20, 1996.

Mentor began marketing Meta emulation technology in December 1995. In January 1996, Quickturn filed its infringement action against Meta and Mentor with the International Trade Commission (ITC). In March 1996, Quickturn moved for a Temporary Exclusion Order (TEO) which was granted in July 1996. In May 1996, Mentor completed its acquisition of Meta.

## *STANDARDS*

█ Injunctive relief in patent cases is authorized by 35 U.S.C. § 283, which provides that an injunction may be granted "in accordance with the principles of equity to prevent the·violation of any right secured by patent, on such terms as the court deems reasonable." While analysis of a request for preliminary injunction is no more rigorous in a patent case than in any other area of the law, *H.H. Robertson Co. v. United Steel Deck, Inc.,* 820 F.2d 384, 387 (Fed.Cir.1987), it is not to be granted lightly. "The grant of a preliminary injunction is the exercise of a very far reaching power never to be indulged

in except in a case clearly warranting it." *Dymo Industries, Inc. v. Tapeprinter, Inc.,* (9th Cir.1964), 326 F.2d 141, 143 (per curiam).

■ Preliminary injunctions in patent cases are controlled by the law of the federal circuit, rather than by the regional circuit, as they involve substantive questions unique to patent law. *Hybritech Incorporated, v. Abbott Laboratories,* 849 F.2d 1446, 1451 (Fed. Cir.1988). Four factors must be considered in analyzing the preliminary injunction motion: (1) whether the movant is likely to succeed on the merits at trial; (2) whether the movant will suffer irreparable harm if preliminary relief is not granted; (3) whether the balance of hardships tips in the movant's favor; and (4) whether a preliminary injunction is in the public interest. *See, e.g., New England Braiding Co. v. A.W. Chesterton Co.,* 970 F.2d 878, 882, 23 U.S.P.Q.2d 1622, (Fed.Cir.1992); *Nutrition 21 v. United States,* 930 F.2d 867, 869, 18 U.S.P.Q.2d 1347 (Fed.Cir.1991). The trial court must weigh each of the factors against the others and the magnitude of the relief requested, and no one factor is necessarily dispositive. *Chrysler Motors Corp. v. Auto Body Panels of Ohio, Inc.,* 908 F.2d 951, 953, 15 U.S.P.Q.2d 1469 (Fed.Cir.1990). However, the absence of an adequate showing on any one factor may suffice, on balance, to justify the denial of the injunction. *Id.*

## DISCUSSION

### I. Timing

■ Mentor asserts that Quickturn is barred from bringing this motion because of the delay between commencement of this action and filing this motion. Mentor argues that applying for a preliminary injunction over a year after the infringement suit was commenced undercuts Quickturn's claim of irreparable and imminent harm. Quickturn points out that it promptly filed its motion for a Temporary Exclusion Order from the ITC, an arguably appropriate first move, as the technology was being imported at that time and there was as yet no sign of domestic manufacture.

Quickturn argues that it could not have discovered Mentor's domestic development earlier. Quickturn points out that Mentor argued in support of its October 1996 motion to dismiss certain counterclaims that it was not making any "meaningful preparation" to move manufacturing to the United States. Reply memo, p. 3. I find that Quickturn's filing was timely.

## II. Elements of Proof

### A. Likelihood of Success on the Merits

■ At the preliminary injunction stage, a plaintiff must make a "clear showing" that it is "reasonably likely" at trial to meet its burden of proving infringement by a preponderance of the evidence. "A reasonable likelihood of success requires a showing of validity and infringement." *Reebok Internat'l, Ltd. v. J. Baker, Inc.,* 32 F.3d, 1552, 1555 (Fed.Cir.1994) (citation omitted). "[W]hen a patentee "clearly shows" that his patent is valid and infringed, a court may, after a balance of all of the competing equities, preliminarily enjoin another from violating the rights secured by the patent." *Atlas Powder Co. v. Ireco Chemicals,* 773 F.2d 1230, 1233 (Fed.Cir.1985).

### 1. Validity

■ Mentor argues that there cannot be infringement because the patent at issue is not valid. I found on summary judgment that assignor estoppel precludes Mentor from contesting the validity and/or enforceability of the Butts '473 patent. Quickturn asserts that Meta is similarly estopped from challenging the validity of this patent due to its privity with Mentor. Mentor contends that in assessing the effect of assignor estoppel, privity cannot be ascribed to a company which was acquired long after the patent at issue was assigned, and therefore Meta should not be prevented from challenging the enforceability of the patent. I disagree.

The cases cited by the parties do not address privity of a wholly owned subsidiary to a finding of assignor estoppel against the parent company and there does not appear to be precedent either way. In this case, I find that it is appropriate to extend the assignor estoppel bar applied against Mentor to its wholly owned subsidiary, Meta. In addition, Mentor's argument is not well founded be-

**1392**

cause it is Mentor, rather than Meta, which intends domestic manufacture and marketing of the accused technology. I therefore find that both Mentor and Meta are estopped from challenging the validity and enforceability of this patent, pursuant to my earlier summary judgment ruling on the issue of assignor estoppel.

## 2. Infringement

■ Infringement analysis is a two-step process. Claim interpretation is the first step. *Miles Laboratories, Inc. v. Shandon, Inc.*, 997 F.2d 870, 876 (Fed.Cir.1993)(citing *Charles Greiner & Co. v. Mari–Med Mfg., Inc.*, 962 F.2d 1031, 1034 (Fed.Cir.1992)). The second step is to determine whether the accused device is within the scope of the claim. *Id.*

### a. Claim interpretation

■ "The first requirement in claim interpretation is to examine the claim language." *SmithKline Diagnostics, Inc. v. Helena Laboratories Corp.*, 859 F.2d 878, 882 (Fed.Cir.1988)(cites omitted). The terms of a claim will be given their ordinary meaning, unless it appears that the inventor used them differently. *York Products, Inc. v. Central Tractor Farm & Family Center*, 99 F.3d 1568, 1572 (Fed.Cir.1996).

■ The devices at issue are hardware logic emulation systems. The claims at issue are claims 7 and 8 of the Butts '473 patent. Quickturn asserts that the Meta–Series 500, the Meta–Series 500M, and the Mentor SimExpress Emulation Systems infringe these claims.

The Butts patent '473 technology and the Meta and Mentor devices include reconfigurable logic chips and interconnect (crossbar) chips, interconnected such that they can imitate proposed circuits. The patent claims call the logic chips "electrically reconfigurable logic circuits," or "ERCLCs," and the interconnect chips are "reconfigurable interconnects," or "reconfigurable interconnect ERCLCs." The interconnect architecture in the '473 patent requires "connecting each of said reconfigurable interconnects to at least one but not all of the pins of a plurality of said N ERCLCs." Claim 7, Butts '473 patent (N equals at least two). Claim 8 requires "connecting each of said reconfigurable interconnect ERCLC(s) to at least one but not all of the pins of each of said N ERCLCs."

The primary claim interpretation argument revolves around the language "each of said" in these two claims. Mentor argues that "each" means that in the claimed device, every interconnect is connected to at least a plurality of the logic chips in the patented device and that this interpretation is most consistent with the ordinary meaning of the language. In contrast, Quickturn contends that it is "each of *said*" interconnects which must be connected to either a "plurality of said" or "each of said" logic chips, in claims 7 and 8, respectively. Quickturn argues that under this interpretation a logic board which includes interconnects which are connected only to other interconnects, not to any logic chip, is covered by the claim language, because those interconnects that do not connect to logic chips are not part of the group of "said" interconnects defined in these claims.

In support of its interpretation, Quickturn states that "Figure 3 of the Butts '473 patent, covered by Claim 7, discloses an emulation structure [which] ... *also includes* additional interconnect chips which do not have any connections to any ERCLCs, but instead serve as additional routing resources[.]" Reply Memo, p. 19 (emphasis in original). Similarly, Quickturn states that "Figure 18 of the Butts '473 patent, covered by Claim 8, expressly discloses the use of additional interconnect chips ... which do not connect to any logic chips but rather only to other interconnect chips[.]"

■ In patents in which there is some ambiguity in the language, the drawings and specifications may provide some clarity. Most cases examining the role of drawings and specifications in claim interpretation deal with specifications in the context of determining patent validity. To assess the validity of a patent, the specifications and drawings can be examined "not to expand or limit the claims, but to explain them[.]" *Beatty Safway Scaffold Co. v. Up–Right, Inc.*, 306 F.2d 626, 631 (9th Cir.1962). "Ambiguity in language may be cleared up by reference to the specifications, but the claim, when unambiguous, can neither be expanded nor contracted

thereby." *Graver Mfg. Co. v. Linde Air Products Co.*, 336 U.S. 271, 277, 69 S.Ct. 535, 93 L.Ed. 672 (1949).

While the patent claims must be precise enough

to guard against unreasonable advantages to the patentee and disadvantages to others arising from uncertainty as to their rights ... [t]his rule does not preclude the court from looking to the specifications and drawings for the purpose of understanding and interpreting the claims of the patent. Indeed, to do otherwise would be to proceed in a vacuum. Neither accuracy nor fairness of decision would be furthered by demanding that a court conceptualize complex patent claims simply in the abstract, without resort to clarifying descriptions ... However, where the claim language is clear, it controls and may not be limited or distorted by resort to specifications, title, or drawings.

*MacLaren v. B–I–W Group Inc.*, 535 F.2d 1367, 1372–73 (2nd Cir.1976) (Citations omitted.)

In an unpublished opinion, the Federal Circuit held that in a proceeding in the Patent and Trademark Office, drawings "may be used like the written specifications to provide evidence relevant to claim interpretation." 1 No. 8 MLRPAT 8 (1993).

The cited drawings in this patent support Quickturn's interpretation of the claim language, while they directly contradict the interpretation advanced by Mentor. Although drawings cannot be relied upon to expand patent claims, it is not reasonable to adopt a claim interpretation which eliminates embodiments presented in the drawings and specifications if there is a viable interpretation which covers the embodiments. I therefore find that there is a reasonable likelihood that Quickturn will be able to prove that claims 7 and 8 of the Butts '473 patent may include a logic emulation device which has interconnects not directly connected to any logic chips.

**b. Application of the claims to the accused device**

 To find infringement, "every limitation set forth in a claim must be found in an accused product or process exactly or by a substantial equivalent." *Becton Dickinson and Co. v. C.R. Bard, Inc.*, 922 F.2d 792, 796 (Fed.Cir.1990) (citation omitted). Quickturn asserts that the ERCLCs of the '473 patent correspond to the logic portion of the Meta–128 chips.

The Meta device consists of logic devices and interconnect devices, located on "Meta 128" chips and "MDC" chips. The Meta 128 chips consist of two halves, a logic device and an interconnect device. Each of the Meta 128 chips which functions as a logic chip is connected to each of the MDC chips. Additionally, some applications include Meta 128 chips in the network which perform interconnect functions only, each of which connects to each of the MDC chips.

Mentor argues that those interconnect-only Meta 128s are connected to each of the MDC interconnect chips, not to any chips with logic function, creating an interconnect architecture in which not all of the interconnects are connected to all of the logic devices as they must be under the Butts partial crossbar interconnect system. Since these interconnect-only Meta 128 chips which do not connect to any logic device are a necessary component of the Meta technology, Mentor argues that the Meta device does not fall within the claims.

 Quickturn reiterates its summary judgment argument that the presence of additional interconnect-only Meta 128 chips on a device which otherwise meets the limitations of the Butts patents does not avoid infringement. "The addition of features does not avoid infringement, if all elements of the patent claims have been adopted." *Northern Telecom, Inc. v. Datapoint Corp.*, 908 F.2d 931, 945 (Fed.Cir.1990). ITC Judge Luckern agreed with Quickturn that the presence of the interconnect only Meta 128 chips in the Meta device is an additional feature, which does not avoid infringement. *See* ITC Initial Determination, Quickturn Ex. 1, p. 86. While findings in the ITC have no preclusive effect on this court, this finding is persuasive. "The district court can attribute whatever persuasive value to the prior ITC decision that it considers justified." *Texas Instruments v. Cypress Semiconductor Corp.*, 90 F.3d 1558, 1569 (Fed.Cir.1996).

Mentor is estopped from challenging the validity of the Butts '473 patent, and Quickturn has shown that it is reasonably likely to be able to prove infringement. Quickturn has met its burden of showing a reasonable likelihood of success on the merits.

## B. Threat of Irreparable Harm

 Quickturn argues that it is entitled to a legal presumption that it will suffer irreparable harm if Mentor is not estopped. "A clear showing of validity and infringement creates a rebuttable presumption of irreparable harm." *Smith Int'l, Inc. v. Hughes Tool Co.,* 718 F.2d 1573, 1581 (Fed.Cir.); *cert. denied,* 464 U.S. 996, 104 S.Ct. 493, 78 L.Ed.2d 687 (1983). As discussed above, both Mentor and Meta are estopped from challenging the validity and enforceability of the '473 patent, and Quickturn has presented a strong argument that the Meta technology infringes these claims. Therefore, there is a presumption of irreparable harm.

 Quickturn further argues that even without a presumption it can show irreparable harm. The considerable financial resources of Mentor would make it possible for Mentor to "delay revenue to win Quickturn customers." Memo in Support, p. 24. Quickturn argues that in this field of hardware emulation, Mentor is its only competitor, and that Mentor's greater financial resources and broader product base will enable it to bundle products and services to deliver the emulation system to customers at a lower price than Quickturn can offer. Further, Quickturn argues that the loss of these sales to Mentor will have repercussions throughout Quickturn, causing it to lose qualified, trained sale representatives because of decreasing commissions, limiting its ability to fund vital research and development, and dramatically lowering its stock prices. Mentor counters that it is not Quickturn's only competitor in this field and presents trade journal articles stating how volatile the price of Quickturn stock has always been. Quickturn retorts that this only goes to show how irreparably it will be damaged if Mentor is not prevented from marketing its emulation products during the pendency of this litigation. While the stock prices are secondary to the discussion of harm to Quickturn, it seems apparent that such a one product company would suffer great economic and market share losses which could be very difficult to calculate and cure by a simple payment if it is found that Meta's device does infringe Quickturn's patent. Thus, Quickturn has shown there is a threat of irreparable harm.

## C. Balance of hardships

 Quickturn contends that Mentor would not be wrongly harmed by a preliminary injunction because it did not invest in creating the product it now intends to manufacture and distribute in the United States. The Meta device was developed in France, with research and development money from the French government. Quickturn further argues that if a preliminary injunction were to wrongly prevent Mentor from completing its United States facility at this time, it still has manufacturing capabilities in France and an existing market outside the United States.

Quickturn also points out that the law does not favor giving a party consideration for a hardship it brings upon itself by undertaking knowing infringement. *See Smith Int'l, Inc., v. Hughes Tool Co.,* 718 F.2d 1573, 1581 (Fed.Cir.1983). In *Smith,* the Federal Circuit reversed the district court's denial of preliminary injunction where the Ninth Circuit had previously declared the patents valid and plaintiff had admitted infringement.

> [I]t is clearly established that Smith knew of the Hughes patents when it designed the F series bits and took a calculated risk that it might infringe those patents. It instituted this action in an attempt to invalidate its competitor's patents, and, having failed, it will not now be heard to say that public policy is in its favor. To the contrary, public policy favors protection of the rights secured by the valid patents. Under these circumstances, we hold that the denial of a preliminary injunction was based on a clear error of law and constituted an abuse of discretion.

*Smith,* 718 F.2d at 1581. In this case, Mentor clearly knew of the Butts patent and the possibility of infringement before it began preparation for production of the Meta devices in the United States.

Mentor simply states that Quickturn has not established that the balance of hardships

favors a preliminary injunction, and that such an injunction would be hard on Meta. As Meta has the financial resources of Mentor behind it and an established market outside the United States, the balance of hardships favors granting the preliminary injunction.

### D. Public interest

Quickturn points out that policy favors enforcing valid patents, while Mentor argues that there is a public policy against monopolies, and Quickturn dominates the vast percentage of the domestic market in emulation hardware. There seems little actual concern that granting this preliminary injunction will have much of an effect on the public.

Thus, of the four factors, it seems 1) likely that Quickturn will succeed on the merits; 2) that Quickturn will be irreparably damaged if Mentor continues its current domestic development; 3) that Mentor has the resources to withstand a preliminary injunction; and 4) that there are no strong public policy arguments affecting this decision. I find that Quickturn has shown that it is entitled to a preliminary injunction.

### CONCLUSION

Quickturn has met its burden of proving that the four factors considered when determining entitlement to a motion for preliminary injunction support granting a preliminary injunction. It is likely 1) that Quickturn will succeed on the merits; 2) that Quickturn will be damaged, perhaps irreparably, if Mentor continues its current domestic development; 3) that Mentor has the resources to withstand a preliminary injunction; and 4) that there are no strong public policy arguments affecting this decision. I find that Quickturn has shown that it is entitled to a preliminary injunction as described above. The scope of the injunction will be defined after submission by the parties of their proposed orders.